IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

COLUMBIA STRATEGIC COUNSEL, INC.,

                Plaintiff,

       v.

INNOVATIVE RAIL TECHNOLOGIES, LLC,
IRA DORFMAN, RICK HERNDON, and MIKE
NICOLETTI,

                Defendants.

Case No.: 3:25-cv-00832-AN

OPINION AND ORDER

        Plaintiff Columbia Strategic Counsel ("CSC") brings this tort and breach of contract action against defendants Ira Dorfman ("Dorfman"), Rick Herndon ("Herndon"), and Mike Nicoletti ("Nicolletti") (with Dorfman and Herndon, the "individual defendants"), and Innovative Rail Technologies, LLC ("IRT") (collectively, "defendants"). Specifically, plaintiff alleges claims for securities fraud, misrepresentation (together, the "tort claims"), and *quantum meruit* against all defendants, as well as claims for breach of contract and breach of the duty of good faith and fair dealing (together with the *quantum meruit* claim, the "contract claims") against IRT. Defendants move to dismiss the action in its entirety for lack of personal jurisdiction, or in the alternative, to transfer venue to the Western District of Texas. For the reasons stated herein, defendant's motion to dismiss is GRANTED.

## LEGAL STANDARD

### A.    Motion to Dismiss for Lack of Personal Jurisdiction

        Federal Rule of Civil Procedure 12(b)(2) allows a party to move for dismissal based on a lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). When evaluating a motion brought under Rule 12(b)(2), a "court may consider evidence presented in affidavits to assist it in its determination and may order discovery on the jurisdictional issues." *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001) (per curiam), *overruled on other grounds by Daimler AG v. Bauman*, 571 U.S. 117 (2014). If a "court decides

the motion without an evidentiary hearing, . . . then 'the plaintiff need only make a prima facie showing of the jurisdictional facts.'" *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008) (quoting *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)). While a "plaintiff may not simply rest on the bare allegations of the complaint[,] uncontroverted allegations must be taken as true, and conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Ranza v. Nike*, 793 F.3d 1059, 1073 (9th Cir. 2015) (citation modified).

**B.      Motion to Transfer Venue**

A party may only bring a case where venue is proper. 28 U.S.C. § 1391(a)-(b). Under 28 U.S.C. § 1391(b), venue is proper (1) in a judicial district where any defendant resides, if all defendants reside in the same state; (2) in a judicial district where "a substantial part of the events or omissions giving rise to the claim occurred"; or (3) "if there is no district in which an action may otherwise be brought . . . , [in] any judicial district where any defendant is subject to personal jurisdiction." As the plain language of the statute indicates, "[t]he first two paragraphs of [Section] 1391(b) define the judicial districts for venue in a typical case," while "the third paragraph provides a fallback option." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 56-57 (2013). For the purposes of venue, a defendant corporation is deemed to reside "in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question[.]" 28 U.S.C. § 1391(c)(2). A plaintiff bears the burden of demonstrating that venue is proper. *See Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979). If venue is improper, the court has discretion to decide whether to dismiss or transfer the case. *See King v. Russell*, 963 F.2d 1301, 1304 (9th Cir. 1992) (per curiam) ("Even though the federal defendants originally requested transfer rather than dismissal, the district court did not abuse its discretion by dismissing.").

1.      *Transfer or Dismissal Under Section 1406(a)*

"When venue is challenged, the court must determine whether the case falls within one of the three categories . . . . If it does, venue is proper; if it does not, venue is improper, and the case must be dismissed or transferred under [28 U.S.C.] § 1406(a)." *Atl. Marine Constr.*, 571 U.S. at 56. Section 1406(a)

provides that when a case is brought in an improper venue, a court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). Transfer is thus required when it is (1) to a court where the case "could have been brought" initially and (2) "in the interest of justice." *Id.*

The first requirement is straightforward: a case could have been brought in any forum with proper venue and personal jurisdiction. *Van Dusen v. Barrack*, 376 U.S. 612, 623 (1964) ("There is no valid reason for reading the words 'where it might have been brought' to narrow the range of permissible federal forums beyond those permitted by federal venue statutes[.]"), *superseded by statute on other grounds as stated in Ross v. Colo. Outward Bound Sch.*, 822 F.2d 1524, 1527 (10th Cir. 1987). The second requirement, that the transfer is in the interest of justice, aims to prevent a plaintiff from being penalized by "'time-consuming and justice-defeating technicalities'" such as the uncertainties of proper venue. *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 467 (1962) (citation omitted). In the Ninth Circuit, "transfer will generally be in the interest of justice, unless it is apparent that the matter to be transferred is frivolous or was filed in bad faith." *Amity Rubberized Pen*, 793 F.3d at 996 (drawing from collected cases). This analysis purposefully entails a narrow and "limited inquiry by the transferring court" because "the interest of justice will rarely be served by one court engaging in a lengthy pre-transfer analysis, only ultimately to send the case to a new court that must start afresh." *Id.*

 2. *Transfer Under Section 1404(a)*

Alternatively, "[u]nder [28 U.S.C.] § 1404(a), [a] district court has discretion 'to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness.'" *Jones v. GNC Franchising Inc.*, 211 F.3d 495, 498 (9th Cir. 2000) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)). A court considering a Section 1404(a) motion to transfer must "weigh the relevant factors and decide whether, on balance, a transfer would serve the convenience of parties and witnesses and otherwise promote the interest of justice." *Atl. Marine Constr.*, 571 U.S. at 62-63 (internal quotation marks and citation omitted). This analysis requires a court to "evaluate both the convenience of the parties" and their private interests, as well as "various public-interest considerations."

*Id.* at 62 & n.6. The private interest factors include:

> "'relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.'"

*Id.* at 62 n.6 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241, n.6 (1981)). The public interest factors, on the other hand, "may include 'the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law.'" *Id.* (alteration in original) (quoting *Piper Aircraft Co.*, 454 U.S. at 241 n.6). Under this analysis, a "plaintiff's choice of forum merits no weight." *Id.* at 63. A valid forum selection clause, however, is "'given controlling weight in all but the most exceptional cases.'" *Id.* (quoting *Stewart Org.*, 487 U.S. at 33).

# BACKGROUND

### A.    Factual Background

Plaintiff alleges that in or around February 2021, Dorfman, a principal at IRT, called Larry LaRocco, who works at a Colorado-based lobbying firm called LaRocco & Associates ("L&A"), and asked him to help IRT secure contracts to convert switcher locomotives from diesel to electric power in the Pacific Northwest. Notice of Removal, ECF [1], Ex. 1 ("Compl."), ¶¶ 6, 10, 19, 22. Plaintiff and IRT would eventually enter three contracts, each with different goals. *See id.* ¶¶ 25-56; *see also* Decl. Ira Dorfman Supp. Defs. Mot. to Dismiss or Transfer Venue ("Dorfman Decl."), ECF [18], ¶¶ 5, 8-9 & Exs. 1-3. In each of the contracts, plaintiff "was the contracting company and L&A served as [plaintiff]'s subcontractor." Decl. Larry LaRocco Supp. Pl. Resp. to Def. Mot. to Dismiss or Transfer Venue ("LaRocco Decl."), ECF [24], ¶ 7.

On February 23, 2021, plaintiff and IRT entered into the first of the three contracts. Compl. ¶ 25. This first contract provided that plaintiff would receive $180,000.00 and a one percent stock equity stake in IRT if plaintiff secured $4.5 million in funding through its lobbying efforts. *Id.* ¶ 28. Notably, this first contract discusses the LaRoccos' connections to Oregon and Washington and provides that plaintiff

would receive an additional 0.5% equity share in IRT if it secured a Letter of Interest "for [the] purchase of an IRT locomotive in Oregon or Washington" by a certain date.  Dorfman Decl. Ex. 1 at 5; *see* Compl. ¶ 28. Plaintiff alleges it agreed to work on contingency based on defendants' misrepresentations, including that IRT "was the only player in the switcher electrification contract industry[,]" that IRT "was sourcing materials wholly within the United States," and that IRT's product was market ready.  *Id.* ¶¶ 24-25, 32.

On December 24, 2021, plaintiff and IRT entered their second contract, which shifted focus to securing contracts with the Port of Portland and the Department of Defense ("DoD").[1]  Dorfman Decl. ¶ 8 & Ex. 2; *see* Compl. ¶ 33.  Not long after signing the second contract, plaintiff and IRT narrowed their efforts to securing a government contract to convert the switcher locomotives in the DoD railyards located at Fort Cavazos in Texas (the "Fort Cavazos contract"). *See* Compl. ¶¶ 36-56.  The second contract expired on December 31, 2022.  Dorfman Decl. Ex. 2 at 1; *see* Compl. ¶ 47.

On January 30, 2023, plaintiff and IRT entered their third contract, Compl. ¶ 48; Dorfman Decl. ¶ 9, Ex. 3, which is the only contract at issue with regard to plaintiff's contract claims.  *See* Compl. ¶¶ 75-78, 80-82.  This contract provided that IRT would issue plaintiff 0.75% equity ownership if plaintiff secured IRT an executed contract to convert one to three DoD locomotives, or 1.5% equity ownership if plaintiff secured a contract for six or more locomotives.  Compl. ¶ 48; Dorfman Decl. Ex. 3 at 1.  The third contract expired on December 31, 2023.  Compl. ¶ 48; Dorfman Decl. Ex. 3 at 1.

Plaintiff's allegations and the evidence before the Court all indicate that, with regard to the third contract, plaintiff worked only on securing the Fort Cavazos contract—*i.e.*, Oregon was no longer within the parties' purview.  *See* Compl. ¶¶ 46-49; *see also* Dorfman Decl. ¶ 9 ("It was at [the time of the third contract] that all CSC/IRT activity relating to Oregon formally ceased."); *and see* Dorfman Decl. Ex. 3 (omitting any reference to Oregon).  To secure the Fort Cavazos contract, plaintiff alleges it undertook many efforts, including, in relevant part, facilitating a presentation by IRT to DoD officials in D.C.;

---

[1] Though immaterial to the Court's analysis, the Court here notes that while plaintiff's complaint alleges that the second contract began on November 19, 2021. Compl. ¶ 13, defendants provide a copy of the contract, which indicates a beginning date of December 24, 2021.

organizing a demonstration of one of IRT's electrified switcher locomotives in Georgia; lobbying senators in D.C. to fund a pilot electrification program; and introducing IRT to Dominion Resources ("Dominion"), the Virginia-based company that manages energy operations at Fort Cavazos.  Compl. ¶¶ 37-56.

At the end of 2023, plaintiff and IRT began negotiating the terms of another contract. Compl. ¶ 57.  Negotiations continued after the third contract expired on December 31, 2023, and into February of 2024.  *Id.*  On February 20, 2024, before any fourth contract was signed, Dorfman informed plaintiff that IRT received the Fort Cavazos contract.  *See id.* ¶ 59.  In response, plaintiff requested the payment outlined by the third contract.  *Id.* ¶ 60.  IRT declined, stating, in relevant part, that the Fort Cavazos contract was secured through Dominion rather than DoD and that the third contract was no longer valid.  *Id.* ¶ 61.

**B.    Procedural Background**

Plaintiff initiated this action on February 26, 2025, and defendant removed to federal court on May 16, 2025.  On July 29, 2025, defendants moved to dismiss the case for lack of personal jurisdiction, or in the alternative, to transfer the action to the Western District of Texas.  Defs. Mot. to Dismiss or Transfer Venue ("Defs. Mot."), ECF [17].  Plaintiff responded in opposition on September 5, 2025.  Pl. Resp. Opp'n to Defs. Mot. ("Pl. Resp."), ECF [23].  Defendants replied on September 19, 2025.  Defs. Reply Supp. Mot., ECF [26].

## DISCUSSION

**A.    Personal Jurisdiction**

Plaintiff has not shown that this Court has personal jurisdiction over defendants.  Because this is a diversity action, the Court looks to Oregon law to determine whether it has personal jurisdiction over defendants.  *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008) ("When no federal statute governs personal jurisdiction, the district court applies the law of the forum state.").  Personal jurisdiction under the Oregon Rules of Civil Procedure ("ORCP") can only reach as far as due process allows.  *See Daimler AG*, 571 U.S. at 125.  Accordingly, the ORCP do not provide the forum any powers beyond those granted by the Constitution.  *See id.*; *and see Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 760 (9th

Cir. 1990) (per curiam) ("Oregon's long-arm statute confers jurisdiction to the extent permitted by due process."). Thus, for this Court's "purposes, jurisdiction under state law and due process are coextensive." *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1161 (9th Cir. 2023).[2]

A court has personal jurisdiction over a defendant when the defendant has "such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" *Ford Motor Co. v. Montana 8th Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316-17 (1945)). The emphasis on defendants' contacts with the forum "led to [the Supreme Court] recognizing two kinds of personal jurisdiction: general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *Id.* Only specific jurisdiction is at issue in this case. *See* Pl. Resp. 4 (arguing only that the Court has specific jurisdiction over defendants).

The Ninth Circuit analyzes specific personal jurisdiction using a three-element test:

> "'(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.'"

*Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d 797, 802 (9th Cir. 2004) (quoting *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)). "The plaintiff bears the burden of meeting the first two prongs while the defendant shoulders the burden on the final prong." *Davis*, 71 F.4th at 1162. Here, plaintiff cannot satisfy

---

[2] Despite this, plaintiff argues that personal jurisdiction is proper under three specific Oregon state rules: (1) ORCP 4(E)(1), because IRT "promis[ed] . . . to pay for [plaintiff's] services to be performed in [Oregon]"; (2) ORCP 4(E)(2), because plaintiff performed services in Oregon that IRT authorized; and (3) ORCP 4(E)(3), because IRT promised to deliver plaintiff equity, a thing of value, in Oregon.[2] Pl. Resp. 6. However, even if the facts of this case could be read to fall into a category of Oregon's jurisdictional statute, that does not mean the Court can dispense with the due process analysis. *See Gray & Co.*, 913 F.2d at 760 n.1 (holding that the district court properly rejected the argument that the due process analysis is not necessary when a defendant's actions fall into a category outlined by ORCP 4(E)). After all, "[t]he courts, not the state legislature, must ultimately decide where the requirements of due process have been met in a particular case." *Id*.

the first prong as to either the contract or tort claims, and thus, the Court need not, and therefore does not, reach the second or third prongs.[3]

Courts "'typically'" evaluate the first prong differently depending on whether a plaintiff brings a tort or a contract claim. *See id.* (quoting *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205-06 (9th Cir. 2006) (en banc) (per curiam)). While there is no "rigid dividing line' between" the two analyses, courts typically apply "[t]he 'purposeful direction' test . . . to tort claims [and] the 'purposeful availment' test . . . contract cases." *Id.* (quoting *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1106 (9th Cir. 2020); *Yahoo! Inc.*, 433 F.3d at 1206); *see Schwarzenegger*, 374 F.3d at 802 ("'we apply different purposeful availment tests to contract and tort cases'" (quoting *Ziegler v. Indian River County*, 64 F.3d 470, 473 (9th Cir. 1995))). In this case, plaintiff brings both contract and tort claims, and, in accordance with the Ninth Circuit's guidance, the Court finds it useful here to evaluate the contract and tort claims using the purposeful availment and purposeful direction tests, respectively.[4]

1. *Contract Claims*

Plaintiff fails to make a *prima facie* showing that defendants purposefully availed themselves of Oregon law. A court analyzing specific jurisdiction in the context of a contract claim must first ask whether the "defendant purposefully availed [itself] of the privilege of doing business in a forum[.]" *See Schwarzenegger*, 374 F.3d at 802. The Supreme Court endorses a "a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.'" *Burger King*,

---

[3] Plaintiff offers little evidence or even argument as to the individual defendants. It thus appears that plaintiff concedes that the personal jurisdiction analysis rises and falls on IRT's connections with Oregon. Accordingly, this Opinion and Order focuses on IRT's connections, which include the individual defendants' work through IRT.

[4] In *Davis*, the Ninth Circuit applied both the purposeful availment and purposeful direction tests to "three causes of action under Idaho state law: (1) liability under Idaho's Product Liability Reform Act; (2) negligence; and (3) willful and reckless misconduct." 71 F.4th at 1160. Although there were no contract claims, plaintiff had contracted with defendant and the Ninth Circuit thus considered the contract in its analysis. *Id.* at 1163. Ultimately, the Ninth Circuit cautioned that there is "no need to adhere to an iron-clad doctrinal dichotomy to analyze specific jurisdiction." *Id.* at 1162. Here, where there are both contract and tort, the Court applies both analyses in turn.

471 U.S. at 478 (quoting *Hoopeston Canning Co. v. Cullen*, 318 U.S. 313, 316-17 (1943)).  Accordingly, neither "contracting with a [plaintiff] resident of the forum state" nor a plaintiff executing a contract within the forum state (where the defendant is not also executing the contract within the forum state) are sufficient to establish jurisdiction over a nonresident defendant.  *Ziegler*, 64 F.3d at 473 (citing *Roth v. Garcia Marquez*, 942 F.2d 617, 621 (9th Cir.1991)); *see McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 816 (9th Cir. 1988) (explaining that the "[plaintiff-]appellants' execution of the contract in [the forum state] is insufficient to meet the 'purposefully availing' part of the 'minimum contacts' test"), *as am. on denial of reh'g & reh'g en banc* (9th Cir. 1988).  While a defendant need not physically enter the forum state to be subject to its jurisdiction, *see Burger King*, 471 U.S. at 475-76, "[a] showing that a defendant purposefully availed himself of the privilege of doing business in a forum state typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there," *Schwarzenegger*, 374 F.3d at 802.In undertaking the purposeful availment analysis in the context of a contract claim, courts ultimately consider the following factors: "prior negotiations[,] contemplated future consequences, . . . the terms of the contract[,] and the parties' actual course of dealing." *Burger King*, 471 U.S. at 479.  If these factors, taken together, demonstrate that a defendant purposefully availed itself of the privilege of doing business in the forum state, then the first prong is satisfied.  *See id.*

     a.    Contract Terms

     The terms of the third contract do not show that IRT purposefully availed itself of Oregon law.  In relevant part, courts consider whether a contract's terms support a finding of purposeful availment by asking (1) whether the contract at issue invokes a particular forum state's laws, and if so, whether the contractual language regarding a proposed forum is mandatory or permissive; and (2) whether the overall focus of the contract is tied to a specific location.[5]  *See Davis*, 71 F.4th at 1164.  Here, the terms of the third contract do not invoke the laws of any specific forum or include a forum selection clause.  *See* Dorfman

---

[5] The personal availment analysis turns only on the third contract because it is the sole basis for all of plaintiff's contract claims and the only contract that had not expired by the relevant time frame. *See* Compl. ¶¶ 74-83, 90 (basing contract claims on plaintiff's work in securing the Fort Cavazos contract); *see also id.* ¶¶ 33, 47 (explaining that the first two contracts expired respectively by August 15, 2021, and December 31, 2022).

Decl. Ex. 3. Nor does the contract mention Oregon at all. *See id.* In fact, the only location the contract references is Washington, D.C., which it references twice: in the first line, where it states "[w]e [plaintiff] are delighted to be a part of the steady outreach IRT has made to public and private sector officials in Washington D.C."; and in the footer, plaintiff's D.C. address appears to be listed. *See id.* at 1. The "one primary goal" of the third contract—*i.e.*, plaintiff "continu[ing] its activities with the Pentagon and other relevant officials to secure [a DoD] contract"—is also tied to D.C. *Id.*; *see* Compl. ¶ 48. Without language favoring or even referencing Oregon, the terms of the third contract disfavor a finding of purposeful availment in this forum.

           b.      Contemplated Consequences

        Similarly, the contemplated consequences of the third contract do not demonstrate that IRT was seeking to avail itself of Oregon law. Again, the "one primary goal" of the contract states "[plaintiff] is to continue its activities with the Pentagon and other relevant officials to secure for IRT an executed contract for six (6) or more DOD locomotives." Dorfman Decl. ¶ 7 Ex. 3. Given that the Pentagon is in D.C. and that plaintiff does not dispute defendants' assertion that there are no applicable DoD railyards in Oregon, it is plain that the contract explicitly contemplates consequences outside of Oregon. *See* Def. Mot. 12 (emphasis added) ("The DOD matters mentioned in Contract #2 were to occur entirely outside of the state of Oregon, for the obvious reason that *there were no rail yards in Oregon from which IRT could seek such business*."). Additionally, by the time the parties signed the third contract, their focus had narrowed specifically to securing the Fort Cavazos contract in Texas. *See* Compl. ¶¶ 40-49 ("[O]n April 15, 2022, IRT . . . gave CSC explicit directions to remain involved at [Fort] Cavazos . . . . There was no slowdown in CSC's work [between the second and third contract and, a]s had been specifically requested by IRT in April 2022, CSC [facilitated the demonstration in Georgia] on May 1, 2023."). Ultimately, the third contract contemplates work to take place outside of Oregon with the aim of securing a contract outside of Oregon. These contemplated consequences do not suggest that IRT was trying to purposefully avail itself of Oregon law.

           c.      Prior Negotiations

From the allegations and evidence submitted, it also does not appear that IRT purposefully availed itself of Oregon's laws through contractual negotiations. In *Burger King*, the negotiations supported a finding of jurisdiction because the defendant "deliberately 'reach[ed] out beyond' Michigan and . . . entered into a carefully structured [twenty]-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida[ and] accept[ed] . . . the long-term and exacting regulation of his business from Burger King's Miami headquarters." 471 U.S. at 479-80. Here, the only insight the Court has into the negotiations preceding the third contract is that plaintiff continued working after the second contract expired and that the parties executed the third contract on January 16, 2023. Compl. ¶¶ 47-48. These sparse facts do not suggest that IRT was trying to reap the benefits of conducting business in Oregon. Far from the carefully structured long-term relationship seen in *Burger King*, the third contract only indicated a one-year commitment. *Compare* 471 U.S. at 479-80, *with* Compl. ¶¶ 47-48. Additionally, while it is unclear where the negotiations took place, IRT presumably completed them outside of Oregon, as there is no indication that any of IRT's principals or agents entered Oregon throughout the course of the parties' relationship. Based on the allegations and evidence submitted, the negotiations leading up to the third contract do not indicate that Oregon was anything other than an intermediate step where plaintiff happened to be based.

> d.    Actual Course of Dealings

Finally, IRT's actual course of dealings relating to the contract also do not suggest it was trying to receive the benefits of conducting business in Oregon. *Davis* is instructive. In that case, the defendant's employees called, emailed, and provided technical advice and assistance remotely to the plaintiff, who was located in the forum state. 71 F.4th at 1164-65. The defendant's employees also made two trips to the forum state, with one trip lasting three days and the other a week. *Id.* During these trips the defendant's employees worked and met with the plaintiff's employees to help achieve the goal of the contract. *Id.* at 1165. On these facts, the Ninth Circuit held that "none of [the defendant's] actual course of dealings in [the forum state] was so substantial or widespread that it reflects [the defendant's] attempt to gain the 'benefits and protections' of the forum state." *Id.* at 1166.

Similarly, in *Picot v. Weston*, the Ninth Circuit found that the defendant's two two-week trips to California throughout the dealings of the contract did not subject them to personal jurisdiction in the forum.[6] 780 F.3d 1206, 1213 (9th Cir. 2015). These trips were not included in the original agreement, the defendant's role in the presentation that took place in California "was relatively small," the trips "lasted only two weeks," and the trips held "no special place in [the defendant's] performance under the agreement[.]" *Id.* Instead, "[t]he bulk of [the defendant's] efforts [executing the contract] were centered in Michigan." *Id.* On these facts, the Ninth Circuit concluded that the defendant's "contacts with California were merely 'random, fortuitous, or attenuated.'" *Id.* (quoting *Burger King*, 471 U.S. at 475).

Here, IRT's connections to the forum through the course of dealings are even weaker than the defendants' connections in *Davis* and *Picot*. IRT's alleged contacts with Oregon during the third contract are limited to their interactions with plaintiff. Indeed, plaintiff alleges that defendants purposefully availed themselves of Oregon law by communicating with, paying, and hiring plaintiff. *See* LaRocco Decl. ¶ 10. Like in *Davis*, however, such remote work alone does not establish purposeful availment. *See* 74 F.4th at 1165; *McGlinchy*, 845 F.2d at 816-17 ("[A plaintiff's] performance in [a forum] cannot give jurisdiction over . . . [a nonresident defendant]; it is [a defendant's] activity that must provide the basis for the jurisdiction."); *see also Picot*, 780 F.3d at 1213 ("[T]he fact that a contract envisions one party discharging his obligations in the forum state cannot, standing alone, justify the exercise of jurisdiction over another party to the contract."). Weakening the connection even further, there is no indication that any of IRT's agents ever traveled to Oregon, only to D.C., for the discussion with government officials, and Georgia, for the product demonstration to ultimately secure a contract in Texas. *See* Compl. ¶¶ 37, 40, 49-50. Not only did the "bulk" of IRT's efforts to execute the contract take place outside of Oregon, *Picot*, 780 F.3d at 1213, but nearly *all* of their efforts appear to have taken place outside of the forum. Accordingly, plaintiff fails to establish the required connection between IRT and Oregon to show purposeful availment.

The closest plaintiff comes to demonstrating a connection between IRT and the forum is

---

[6] The Ninth Circuit indicated that the length of the second trip was unclear but that it presumed the second trip, like the first trip, lasted two weeks. *See Picot*, 780 F.3d at 1213.

that plaintiff introduced IRT to Oregon-based companies.  *See* LaRocco Decl. ¶ 10.  Each of these introductions, however, took place under the first or second contracts, whereas plaintiff explicitly bases its claims on the third.  *See* Compl. ¶¶ 28-32; *see also* Dorfman Decl. ¶¶ 5, 8 & Exs. 1, 2.  Regardless, even if these allegations had occurred under the third contract, they would be insufficient to establish jurisdiction. There is no indication that these introductions consisted of anything more than phone calls or resulted in any executed contracts in Oregon.  *See* Dorfman Decl. ¶ 8 ("To the best of my recollection, the sole contact IRT had with the Port of Portland was a phone call.").  Like the visits in *Picot*, introductions made during one-off phone calls with Oregon-based businesses are not sufficient to establish that IRT was seeking to "invok[e] the benefits and protections" of Oregon law.  *Burger King*, 471 U.S. at 475 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)); *see Picot*, 780 F.3d at 1213.

Ultimately, each of the relevant factors suggest that plaintiff does not satisfy the purposeful availment prong of the specific personal jurisdiction analysis for the contract claims.  Without establishing purposeful availment, plaintiff's contract claims fail, and the Court therefore does not reach the issues of relatedness or reasonableness as to these claims.  *See Picot*, 780 F.3d at 1215.

2.     *Tort Claims*

As to the tort claims, plaintiff has also failed to show that defendants purposefully directed activities toward Oregon.  Courts analyzing purposeful direction look to the "'effects' test from *Calder v. Jones*[, 465 U.S. 783 (1984)]"  *Davis*, 71 F.4th at 1163.  The effects test "requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."  *Schwarzenegger*, 374 F.3d at 803 (quoting *Dole Food*, 303 F.3d at 1111).  Importantly, the express aiming requirement asks whether a defendant directed their activities at the *forum*, not just at a plaintiff residing within the forum.  *Walden v. Fiore*, 571 U.S. 277, 287 (2014) (interpreting *Calder*, 465 U.S. at 788-89).  While defendants did commit an intentional act here, plaintiff fails to make a *prima facie* showing that defendants' alleged tortious conduct was expressly aimed at Oregon instead of being merely aimed at plaintiff.

To satisfy the intentional act requirement, "the defendant must act with the 'intent to

perform an actual, physical act in the real world.'" *Picot*, 780 F.3d at 1214 (quoting *Schwarzenegger*, 374 F.3d at 806). While Herndon and Nicoletti's specific involvement is unclear, plaintiff appears to allege that it conducted business with all of the defendants and that the parties worked together to execute the contracts. By contracting and working with plaintiff, the defendants committed an intentional act. *See, e.g.*, *Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, No. SACV 10-1172-AG (MLGx), 2011 WL 13153190, at *5 (C.D. Cal. May 12, 2011) (finding that entering a contract, which involved hiring the other party and sending communications, was a sufficient intentional act); *Khazai v. Grover*, No. 2:22-cv-00100-SPG-KS, 2023 WL 12036688, at *8 (C.D. Cal. Apr. 20, 2023) (same). Therefore, the first prong of the effects test is satisfied.

However, plaintiff fails at the second prong, as this intentional act was not aimed at Oregon. Courts consider two factors to determine whether the allegedly tortious action was expressly aimed at a forum:

> "(1) First, the relationship must arise out of contacts that the defendant *himself* creates with the forum State. . . . Put simply, however significant the plaintiff's contacts with the forum may be, those contacts cannot be decisive in determining whether the defendant's due process rights are violated.
>
> "(2) Second, our 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."

*Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1143 (9th Cir. 2017) (quoting *Walden*, 571 U.S. at 284-85). "[T]he plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction[.]" *Walden*, 571 U.S. at 285. Plaintiff argues that defendants expressly aimed their allegedly tortious action toward Oregon because defendants knew plaintiff was based in Oregon. However, that knowledge is not enough to satisfy the express aiming requirement. *See Morrill*, 873 F.3d at 1143 (second alteration in original) ("As the Supreme Court stated in *Walden* . . . , the 'mere fact that [a defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction.'" (quoting *Walden*, 571 U.S. at 291)); *see also Picot*, 780 F.3d at 1214 (recognizing that under the *Walden* framework, the express aiming requirement is not satisfied simply because a defendant targets a resident of the forum.).

"'[S]omething more'—conduct directly targeting the forum"—is required to confer personal jurisdiction. *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 980 (2021) (alteration in original) (quoting *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1229 (9th Cir. 2011)).

By contrast, in *Calder v. Jones*, the Supreme Court held that the Florida-based authors of a nationally published libelous article about a California resident can be subject to jurisdiction in California because "the reputation-based 'effects' of the alleged libel connected the defendants to California, not just to the plaintiff." *Walden*, 571 U.S. at 287 (describing *Calder*, 465 U.S. at 783). Due to the nature of the libel tort, the court reasoned that the tort technically occurred in California and plaintiff's injury "would not have occurred but for the fact that the defendants wrote an article for publication in California that was read by a large number of California citizens." *Id.* at 287-88. Put another way, circulating the article in California to other Californians constituted "something more" than the defendants merely committing a tortious action against a Californian plaintiff. *Ayla*, 11 F.4th at 980; *see Walden*, 571 U.S. at 287-88. Here, there is nothing more.

*Ayla* also sits in contrast to the present case. The defendant in *Ayla*, who allegedly infringing on the plaintiff's trademark, did "something more" to connect itself to the forum state by making "significant advertising efforts" that specifically targeted the forum and the people within it. 11 F.4th at 980 (internal quotation marks omitted). The Ninth Circuit thus found that the Australia-based defendant had expressly aimed their allegedly infringing behavior at the United States through posts stating "'ATTENTION USA BABES WE NOW ACCEPT afterpay'"; mentioning "'Black Friday' sales," which are especially connected to America; and advertising that its products were featured in American magazines. *Id.* The Ninth Circuit concluded that "[t]hese connections are not premised on [the defendant's] connection to the plaintiff. Rather, each of these connections are between [the defendant] and the forum itself." *Id.*

Here, plaintiff does not establish that "something more" than the parties' relationship connected defendants to Oregon. Plaintiff alleges that defendants made material misrepresentations, including IRT having no competition in the switcher electrification industry, IRT sourcing only American-made materials, and IRT being market ready. Compl. ¶¶ 24, 67-73, 84-88. Defendants allegedly made

these representations directly to plaintiff from outside of Oregon. *See id.* Unlike in *Calder* or *Ayla*, defendants' alleged torts in this case did not technically occur in Oregon, involve the Oregon populace, or utilize independent Oregon-based resources. *See Walden*, 571 U.S. at 288 (describing *Calder*, 465 U.S. at 783); *see also Ayla*, 11 F.4th at 980. The alleged misrepresentations were not made in Oregon or circulated in the forum through an Oregon newspaper, magazine, radio channel, or by another Oregonian. There is no indication that the alleged misrepresentations included or impacted anyone in Oregon besides plaintiff. The only other person plaintiff alleges that was even tangentially affected by defendants' alleged misrepresentations was Illinois Senator Richard Durbin, which hardly connects defendants to Oregon. *See* Compl. ¶ 24 ("[Plaintiff] was forced to walk back a statement to Illinois Senator Richard Durbin about the lack of competition in the switcher electrification space.").

Plaintiff is the only nexus between Oregon and the alleged misrepresentations. Had plaintiff decided to relocate their business from Oregon to any other state, the effects of the misrepresentation, not meaningfully tethered to Oregon, would have followed plaintiff wherever it moved. *See Walden*, 571 U.S. at 290; *see also Picot*, 780 F.3d at 1215. With no connection between Oregon and the alleged misrepresentations beyond plaintiff's location, the effects test fails at the express aiming prong. Because the defendants did not expressly aim their allegedly tortious conduct at Oregon, there is no purposeful direction. Therefore, the personal jurisdiction analysis for plaintiff's tort claims, and the Court need not, and therefore does not, reach the relatedness or reasonableness elements of the specific jurisdiction analysis. *See Picot*, 780 F.3d at 1215.

Having found that plaintiff failed to make *prima facie* case for purposeful availment or purposeful direction, the Court finds that it lacks personal jurisdiction over the defendants and turns to the question of venue.

## B.    Venue

Even without personal jurisdiction, the Court has the discretion to transfer the venue of a case if it is in the interest of justice. *See Goldawr*, 369 U.S. at 466. The Court finds that Oregon is not a proper venue for this case, and that transferring this case would not be in the interest of justice.

1.    *Venue in Oregon*

Even separated from the personal jurisdiction analysis, plaintiff fails to establish that Oregon is a proper venue.  Plaintiff's sole argument is that Oregon is a proper venue because the only plaintiff in this case resides in Oregon.  Pl. Resp. 11.  This argument is based on a provision that the legislature amended out of 28 U.S.C. § 1391 in 1990.  *Compare* 28 U.S.C. § 1391 (2025), *with* 28 U.S.C. § 1391 (1989).  Because the current version of the statute does not determine venue based on where a plaintiff resides, and because plaintiff raises no other arguments, the Court finds that venue is not proper in Oregon.

2.    *Transferring Venue*

It appears that there are multiple jurisdictions where this case could have been brought appropriately.  In the interest of judicial economy, and having found that Oregon is decidedly not one of those jurisdictions, this Court declines to conduct further analysis into the proper forum.  *See Amity*, 793 F.3d at 996 ("[T]he interest of justice will rarely be served by one court engaging in a lengthy pre-transfer analysis, only ultimately to send the case to a new court that must start afresh.").

## CONCLUSION

For the reasons stated herein, defendants' Motion to Dismiss or Transfer Venue, ECF [17], is GRANTED as to the Motion to Dismiss.  This case is DISMISSED WITHOUT PREJUDICE to refiling in an appropriate forum.  No transfer shall be ordered.

IT IS SO ORDERED.

DATED this 11th day of December, 2025.

Adrienne Nelson
United States District Judge